1
2
3
4
5
6                          IN THE UNITED STATES DISTRICT COURT

7                             FOR THE DISTRICT OF ARIZONA

8    John Doe, et al.,                    )    No.  CV-16-03001-PHX-SPL
                                          )
9                                         )
                    Plaintiffs,           )    **ORDER**
10   vs.                                  )
                                          )
11                                        )
     Heritage Academy, Inc., et al.,      )
12                                        )
                                          )
13                  Defendants.           )
                                          )
14   _____       )

15          Plaintiffs John Doe and Reverend David Felten commenced the instant action on

16   September 7, 2016, and filed a First Amended Complaint on November 11, 2016 (Doc.

17   39). Pending at issue are multiple motions and requests filed by the parties (Docs. 3, 50,

18   83, 87, 88, 95, 96, 72, 104); the Court addresses each in turn as follows.

19   **I.     Background**

20          Heritage Academy, Inc., Heritage Academy Laveen, Inc., Heritage Academy

21   Queen Creek, Inc. (collectively "Heritage") are charter holders sponsored by the Arizona

22   State Board of Charter Schools to operate public charter schools in Arizona. The three

23   school campuses at issue here, referred to as Mesa, Gateway, and Laveen, teach grades 7-

24   12, and together enroll more than 1100 students. (Doc. 39 ¶¶ 26-31.)

25          Plaintiffs allege that the curriculum at Heritage schools includes religious

26   instruction for "the purpose and effect of… advanc[ing] and endors[ing] specific

27   religious viewpoints and beliefs, namely, the beliefs of Defendant Taylor, his

28   organization (the NCCS), and W. Cleon Skousen." (Doc. 39 ¶¶ 53, 232.) Specifically,

Plaintiffs point to a mandatory senior-level course entitled "American Government," and an elective senior-level course entitled "Healing of America," which are taught by Taylor (Doc. 39 ¶¶ 54-182), as well an American Government coursework textbook entitled "Proclaim Liberty Throughout all the Land," that is alleged to be largely comprised of publications authored by Skousen, including "A Miracle that Changed the World: The 5000 Year Leap" and "The Making of America." (Doc. 39 ¶¶ 55-58.) Plaintiffs claim that this religious instruction violates the Establishment Clause of the First Amendment of the U.S. Constitution and articles of the Arizona Constitution.

Plaintiff Doe is "an Arizona taxpayer and the parent of at least one child currently attending Heritage Academy." (Doc. 39 ¶ 50.) Plaintiff Felten "is the head pastor of The Fountains, a United Methodist Church in Fountain Hills, Arizona," an Arizona taxpayer, and a "parent of a student who attends an Arizona charter school." (Doc. 39 ¶ 51.) In their First Amended Complaint, Plaintiffs sue Heritage, the members of the governing bodies of Heritage, Heritage founder and director Earl Taylor Jr., the members of the Arizona State Board for Charter Schools, the Executive Director of the Arizona State Board for Charter Schools, the Superintendent of Public Instruction, and the Director of the Arizona Department of Administration.

Plaintiffs seek declaratory and injunctive relief, nominal damages, costs, and attorneys' fees. With regard to injunctive relief, Plaintiffs ask that the Court issue an injunction: (1) prohibiting Heritage "from providing religious instruction or using religious instructional materials;" (2) requiring the Arizona State Board for Charter Schools "to ensure that the public charter schools that it sponsors comply with the Establishment Clause and the Arizona Constitution, including by revoking or refusing to renew the charters of offending schools;" (3) prohibiting the Superintendent of Public Instruction "from certifying any apportionment of public funds to Heritage Academy if, and for as long as, Heritage Academy provides religious instruction to its students or employs religious instructional materials in violation of the U.S. and Arizona Constitutions; and (4) prohibiting the Director of the Department of Administration

"from providing state funding to Heritage Academy if, and for as long as, Heritage Academy provides religious instruction to its students or employs religious instructional materials in violation of the U.S. and Arizona Constitutions." (Doc. 39 § V.)

## II.   Standing

"To state a case or controversy under Article III, a plaintiff must establish standing." *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 133 (2011). The "irreducible constitutional minimum of standing" is comprised of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).[1] "The constitutional requirement of standing has three elements: (1) the plaintiff must have suffered an injury-in-fact—that is, a concrete and particularized invasion of a legally protected interest that is actual or imminent, not conjectural or hypothetical; (2) the injury must be causally connected—that is, fairly traceable—to the challenged action of the defendant and not the result of the independent action of a third party not before the court; and (3) it must be likely and not merely speculative that the injury will be redressed by a favorable decision by the court." *Catholic League for Religious and Civil Rights v. City and County of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) (citing *Lujan*, 504 U.S. at 560-61; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982)).[2] The plaintiff bears the burden of establishing the existence of a justiciable case or controversy, and "'must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Federal Election Comm'n*,

---

[1]   Because the requirements of Article III standing are an "irreducible constitutional minimum," and is an underlying dispute within the parties' various filings, the Court first resolves "doubts about this constitutional issue *sua sponte*." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 907 (9th Cir. 2011).

[2]   The doctrine of standing encompasses both constitutional requirements and prudential considerations. *See Valley Forge*, 454 U.S. at 471; *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1057 (9th Cir. 1996). The prudential limitations on federal court jurisdiction dictate that: (1) a party must ordinarily assert its own legal rights and interests, and not those of others; (2) the harm asserted must not be a mere "generalized grievance" (i.e. "abstract questions of wide public significance"); and (3) the interest claimed must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge*, 454 U.S. at 474-75; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009).

554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "Where, as here, a case is at the pleading stage, the plaintiff must clearly... allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (internal quotations omitted).

### A.   Taxpayer Standing

Plaintiffs allege that they are injured by the payment of public tax dollars to Heritage "because Plaintiffs, as taxpayers, are having their tax dollars unlawfully spent to promote and support religion and religious instruction." (Doc. 36 ¶¶ 50-51, 236, 244.)

"[T]axpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006). *See also Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 134 (2011); *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587 (2007); *Bowen v. Kendrick*, 487 U.S. 589, 618-20 (1988); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 477-80 (1982); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *United States v. Richardson*, 418 U.S. 166, 171-73 (1974); *Flast v. Cohen*, 392 U.S. 83 (1968); *Doremus v. Bd. of Educ.*, 342 U.S. 429, 433-34 (1952); *Frothingham v. Mellon*, 262 U.S. 447, 486-89 (1923). This is because the interests of a taxpayer in the money that the treasury collects from state taxes is shared in common with all other state taxpayers, and is therefore "too generalized and attenuated to support Article III standing." *Hein*, 551 U.S. at 599; *see also DaimlerChrysler*, 547 U.S. at 344. "[I]f every [] taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus." *Hein,* 551 U.S. at 593.

It follows that "'taxpayer standing,' by its nature, requires an injury resulting from a government's expenditure of tax revenues." *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 793 (9th Cir. 1999). *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 613-14 (1989) ("we have refused to confer standing upon a state taxpayer absent a showing of 'direct

injury,' pecuniary or otherwise"). A state taxpayer can establish this test with a "good-faith pocketbook action," which is an injury to the taxpayer's "direct and particular financial interest ...." *Doremus,* 342 U.S. at 434-35. Plaintiffs do not make such a showing here.

It is apparent that the constitutional grievance Plaintiffs seek to litigate here "is not a direct dollars-and-cents injury." *Doremus,* 342 U.S. at 434. There is no allegation that the religious instruction at Heritage increases any tax Plaintiffs "do pay or that as taxpayers they are, will, or possibly can be out of pocket because of it." *Doremus*, 342 U.S. at 433. There are no allegations that a "measurable appropriation or disbursement" of public funds are expended on Heritage's religious instruction. *Doremus,* 342 U.S. at 434. *Cf. PLANS, Inc. v. Sacramento City Unified Sch. Dist.*, 319 F.3d 504, 508 (9th Cir. 2003) (finding municipal taxpayer standing where "PLANS challenge[d] the Waldorf school curriculum as a whole, and ha[d]… shown that a measurable amount of public funds support the Waldorf schools"). Nor is there any allegation that the religious instruction "is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school." *Doremus*, 342 U.S. at 433.  In fact, Plaintiffs do not identify any specific cost that arises as a result of the religious activity challenged, any specific amount of public funds that are apportioned to Heritage, or any dollar amount for that matter. Plaintiffs simply provide that the Superintendent of Public Instruction and the Director of the Department of Administration "disburs[e] or caus[e] to be disbursed public funds to Heritage Academy, with the result that public tax dollars are directly funding religious instruction and the purchase of religious instructional materials." (Doc. 39 ¶ 235; s*ee also* ¶ 232.i ("The Heritage Academy Defendants expend public tax dollars on religion, religious instruction, and religious instructional materials.").)

In their filings, Plaintiffs rely on *Flast v. Cohen*, 392 U.S. 83 (1968) to support their claim of taxpayer standing. (*See* Doc. 53 at 2, 5.) In *Flast*, the Supreme Court "carved out a narrow exception" in which taxpayers have standing to bring an

Establishment Clause challenge to the use of public funds.[3] *Hein*, 551 U.S. at 602. In order to qualify for taxpayer standing under *Flast*, two factors must be met. First, there must be a "logical link" between the plaintiff's taxpayer status and the "legislative enactment attacked." *Flast,* 392 U.S. at 102. In other words, the taxpayer must show that it challenges an expenditure of funds made pursuant to the legislature's authority to tax and spend, rather than an incidental expenditure of funds in the administration of an essentially regulatory statute. *See Hein*, 551 U.S. at 588 ("Given that the alleged Establishment Clause violation in *Flast* was funded by a specific congressional appropriation and was undertaken pursuant to an express congressional mandate, the Court concluded that the taxpayer-plaintiffs had established the requisite 'logical link between [their taxpayer] status and the type of legislative enactment attacked.'"). Second, there must be "a nexus" between the plaintiff's taxpayer status and "the constitutional infringement alleged." *Flast*, 392 U.S. at 102. Alternatively stated, the taxpayer must show that the government is violating a particular constitutional provision with the expenditure. *Id.* A plaintiff must satisfy both prongs of this test to demonstrate it has "a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction." *Id.* at 103. Plaintiffs however do not allege facts which satisfy either prong of *Flast* here.

The allegations here do not offer any link between the challenged expenditures of public funds and an exercise of legislative power. Plaintiffs' challenges do not arise from any specific legislative enactment, appropriation, or action. *See Hein,* 551 U.S. at 605. Instead, the "expenditures" challenged are the product of actions made by executive-branch agencies and officers in carrying out their official duties. *See Valley Forge*, 454 U.S. at 479 ("the source of [plaintiffs'] complaint is not a congressional action, but a decision by [the Secretary] to transfer a parcel of federal property"); *Richardson*, 418

---

[3]     While the narrow exception identified by *Flast* has been found to confer taxpayer standing in challenges to congressional expenditures of federal taxes, the Supreme Court has not expressly foreclosed the application of *Flast* to analogous state taxpayer challenges. *See e.g., Winn*, 563 U.S. at 133 (considering whether state taxpayers had standing under *Flast* to challenge state tax credits).

U.S. at 175 ("Although the status he rests on is that he is a taxpayer, his challenge is not addressed to the taxing or spending power, but to the statutes regulating the CIA, specifically 50 U.S.C. 403j(b). That section provides different accounting and reporting requirements and procedures for the CIA, as is also done with respect to other governmental agencies dealing in confidential areas").

Plaintiffs challenge the Superintendent of Public Instruction's certification of apportionment of public funds to Heritage. This is not an exercise of legislative spending power. Appropriations from the State's General Fund and from other funds, such as the Permanent State School Fund, are made for the Arizona Department of Education. Public charter schools[4] are apportioned funding from those appropriations by the Arizona State Board of Education based on certain factors and formulas. *See* Ariz. Rev. Stat. § 15-185(B)(5) ("The state board of education shall apportion state aid from the appropriations made for such purposes to the state treasurer for disbursement to the charter schools in each county…"); §§ 15-185(J), 37-521(B) ("A charter school may receive and spend monies distributed by the department of education" from the Permanent State School Fund "pursuant to article X, section 7, Constitution of Arizona, plus monies derived from the rental of the lands and property, interest and accrued rent"); Ariz. Att'y. Gen. Op. No. I15-005 (2015), 2015 WL 4115515 (discussion of monies distributed to charter schools

---

[4] Charter schools are established by contract between a sponsor (which may be a school district governing board, the State Board of Education, or the State Board for Charter Schools) and a public body, private person, or private organization. A.R.S. §§ 15-101(3)-183(B). The charter school sponsor provides initial authorization for a charter school, has continuing oversight responsibility, and has sole control of whether to renew a school's charter. A.R.S. § 15-183(R). The Legislature mandates the general components of the charter, school operation, school accountability, school financial requirements, and responsibilities of the charter school governing body. A.R.S. § 15-183(E). All charter schools may contract, sue and be sued, and hold property. A.R.S. § 15-183(H), (T). Thus, charter schools are distinct legal entities, with legal responsibilities independent of their public or private operators.

Ariz. Att'y Gen. Op. No. I04-006 (2004), 2004 WL 170819, at *1.

by weight). Thereafter, those apportioned amounts are certified by the Superintendent of Public Instruction. *See* Ariz. Rev. Stat. § 15-185(B)(7) ("the superintendent of public instruction shall furnish to the state treasurer an abstract of the apportionment and shall certify the apportionment to the department of administration…"); § 15-251.

In sum, the apportionment of funding for specific charters is a decision made by an agency, and the certification of the apportioned funding is an action performed by an executive-branch official in the administration of regulatory functions. Certification is therefore not an exercise of legislative spending power as there is no allegation which might support that the apportionment of funding for specific charters, such as Heritage, are themselves legislative appropriations. *See Hein*, 551 U.S. at 607; *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'"); *Arizona Association of Providers for Persons with Disabilities v. State*, 219 P.3d 216, 227 (Ariz. Ct. App. 2009) (while "the power to appropriate funds is exclusively a legislative function," "an executive agency has discretion to allocate a lump-sum appropriation as it sees fit").

Plaintiffs challenge the Director of the Department of Administration's disbursement of public funds to Heritage. *See* Ariz. Rev. Stat. § 15-185(B)(7) ("the department of administration… shall draw its warrant in favor of the charter schools for the amount apportioned"); § 41-732. This too is an executive action performed in the administration of regulatory functions. Because the disbursed funds are not expenditures of legislated appropriations, but rather apportionments by an agency from a lump-sum appropriation, the processing and payment of those funds is not an exercise of authority conferred by the legislature's taxing and spending power. *Cf. Bowen v. Kendrick*, 487 U.S. 589, 619-20 (1988) (*Flast* standing found where Secretary merely administered "a

program of disbursement of funds pursuant to Congress' taxing and spending powers").

Lastly, Plaintiffs challenge Heritage's expenditure of public funds for religious instruction and materials. This does not qualify as a legislated expenditure of public funds for purposes of *Flast*. No allegations have been offered which might suggest that the appropriations to the Arizona Department of Education "expressly authorize, direct, or even mention" the expenditures of public funds allegedly made by Heritage. *See Hein*, 127 S.Ct. at 2566. Nor do Plaintiffs show that either the legislature or the state agencies contemplate the expenditure of state aid for religious instruction. In fact, Plaintiffs' allegations and Arizona law suggest only the contrary. *See* Ariz. Const. Art. IX § 10 ("No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation"); Ariz. Const. Art. II § 12 ("No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment"); (Doc. 39 ¶ 23 ("The Board's oversight responsibility includes ensuring that its sponsored public charter schools remain 'nonsectarian in [their] programs, admissions policies and employment practices and all other operations."")). In short, there are no allegations which show that the legislature has extracted tax dollars for the establishment and implementation of religious instruction at Heritage, much less for Heritage itself. At issue here is, at most, an "incidental expenditure of tax funds." *Flast,* 392 U.S., at 102. *See Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 796 (9th Cir. 1999) ("The Court in *Flast* simply used the term "incidental" to describe the type of indirect support that flows to an activity when the government does not spend "a measurable appropriation or disbursement" solely on the challenged activity").

Because the allegations do not show that they have or will suffer a direct taxpayer injury, or that this case falls within the narrow exception provided by *Flast*, Plaintiffs lack taxpayer standing.

**B.    John Doe**

Plaintiffs argue that "Doe, as the parent of at least one child currently attending a

Heritage Academy school, has standing to challenge that school's violation of his right to direct the religious upbringing of his child or children." (Doc. 53 at 7; Doc. 39 ¶ 50.) Doe "believes that it is his responsibility—not the state's—to provide for his child or children's religious education. Doe objects to and is offended by Heritage Academy's and Defendant Taylor's instruction that exposes Doe's child or children, and all Heritage students, to religious beliefs and that directs the students to express those beliefs in graded assignments. Doe believes that, through this religious instruction, Taylor and Heritage Academy have elevated some religious beliefs over other religious beliefs and religion over nonreligion, and have usurped and violated his constitutional rights as a parent." (Doc. 39 ¶ 50.) "Doe's minor children are subject to unwanted religious instruction." (Doc. 39 ¶¶ 236, 244.)

Doe, as the parent of a child who is a student at Heritage has standing to challenge that school's violation of his right to direct the religious upbringing of his child. *See Madison*, 177 F.3d at 795 ("[p]arents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right."); *Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1532 (9th Cir. 1985) ("Grove has standing as a parent whose right to direct the religious training of her child is allegedly affected."); *Wisconsin v. Yoder*, 406 U.S. 205, 205 (1972); *Schempp*, 374 U.S. at 224 n. 9 (finding that while plaintiffs lacked standing as state taxpayers, they had standing as parents where their children were enrolled in public schools and so were "directly affected" by the challenged laws); *see also Valley Forge*, 454 U.S. at 486 n. 22.

The Court agrees that, at this stage, the allegation that Doe's child is a student presently enrolled at Heritage is sufficient for standing. The complaint alleges that "[a]ll Heritage students must pass [the] required American Government course taught by Defendant Taylor in order to graduate from high school." (Doc. 39 ¶ 54.) Thus, there are sufficient allegations from which it may be reasonably inferred that Doe's child has or will be subject to the offending conduct. *See Lee v. Weisman*, 505 U.S. 577, 584 (1992) ("Deborah Weisman is enrolled as a student at Classical High School in Providence and

from the record it appears likely, if not certain, that an invocation and benediction will be conducted at her high school graduation").

### C.    Reverend David Felten

Felton maintains standing on the basis that he "is offended by and objects to the... religious instruction by Taylor and Heritage Academy to public-school students." (Doc. 39 ¶ 51.) Felton has been "harmed, intimidated, and distressed by the Heritage Academy Defendants' endorsement and promotion of religious views, which [he] believe[s] should not be taught in public schools." (Doc. 39 ¶¶ 233, 241.) These allegations fail to establish that Felton has suffered an injury that is sufficiently concrete or particularized to maintain standing.

Unlike Doe, who claims an injury arising from the religious education of his child at Heritage, Felton has alleged "no more than an abstract objection" to religious instruction in public schools. *See Vasquez v. Los Angeles County*, 487 F.3d 1246, 1251 (9th Cir. 2007) (internal quotation marks omitted). True, "[t]he concept of a 'concrete' injury is particularly elusive in the Establishment Clause context ... because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature." *Catholic League*, 624 F.3d at 1049. However, "claims of injury that are purely abstract, even if they might be understood to lead to the psychological consequence presumably produced by observation of conduct with which one disagrees, do not provide the kind of particular, direct, and concrete injury that is necessary to confer standing to sue in the federal courts." *ASARCO*, 490 U.S. at 616 (internal quotations and citations omitted).

Nor do the allegations show that Felton's alleged injury arising from the religious instruction at Heritage is particularized. (*See* Doc. 39 ¶ 51.) *See Schempp,* 374 U.S. at 224 n. 9 (parents of children had standing because they were "directly affected by the laws and practices against which their complaints are directed"); *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"). There is no allegation that the religious

11

instruction at Heritage is a direct attack on Felton's specific belief systems or that it has impacted his actions in any manner. *Cf. Catholic League*, 624 F.3d at 1052 (finding standing where plaintiffs alleged they were "directly stigmatized" by city action, which made them feel "like second-class citizens"). In fact, there is no allegation as to even how Felton learned about the religious instruction at Heritage. Felton asserts only a generalized grievance; he suffers no personalized injury distinct from the harm that would be visited by any member of the general public with the same beliefs. The fact that Felton is the parent of school-age children makes his position no less remote and does not differentiate him from other bystanders who object to religious teachings in public schools. *See Caldwell v. Caldwell*, 545 F.3d 1126, 1133 (9th Cir. 2008).

Therefore, having failed to allege a concrete and particularized injury that can be redressed by this Court, Felton is dismissed for lack of standing.

### D.    Superintendent and Director

As Plaintiffs fail to allege a taxpayer injury arising from the expenditure of public funds by Heritage, they fail to demonstrate that they have suffered an injury that is traceable to the certification of apportionment of public funds by the Superintendent of Public Instruction or the disbursement of public funds by the Director of the Department of Administration. *See Lujan,* 504 U.S. at 560 (for Article III standing, "there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly... traceable to the challenged action of the defendant"); *Clapper v. Amnesty Intern. USA*, 133 S.Ct. 1138, 1148 (2013) (injury cannot be the result of an "attenuated chain of possibilities"); *Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1227 (9th Cir. 2008); *Allen v. Wright,* 468 U.S. 737, 757 (1984) (the "line of causation" between a defendant's actions and a plaintiff's alleged harm must be more than "attenuated."). As previously addressed, the source of Plaintiffs' complaints is not the disbursement or receipt of funding by Heritage. Instead, the alleged injuries arise from Heritage's implementation of religious instruction, the Arizona State Board of Charter Schools' failure to exercise its authority to cease Heritage's religious instruction. A

causal link between the actions of the Superintendent and Director and the injury suffered by Doe is lacking.

Therefore, the Director of the Department of Administration is dismissed. The claims against the Superintendent of Public Instruction with regard to the certification of apportionment of public funds are also dismissed.[5]

### D.     Heritage and Arizona Board of Charter Schools

In brief, the complaint set forth facts that sufficiently allege: (1) Doe has a child that attends a Heritage school; (2) Heritage provides unwanted religious instruction; (3) the Arizona State Board of Charter Schools has oversight and remedial authority over Heritage; (4) the Arizona State Board of Charter Schools received complaints regarding the unconstitutional religious instruction at Heritage; and (5) the Arizona State Board of Charter Schools failed to take corrective action. Based on these allegations, Doe has standing to seek an injunction that enjoins the religious instruction at Heritage and mandates the exercise of oversight and remedial authority over Heritage by the Arizona State Board of Charter Schools.

The demand for injunctive relief against the Arizona State Board of Charter Schools-Defendants however seeks far more than this. The complaint seeks an injunction against the members and Executive Director of the Arizona State Board for Charter Schools "requiring them to ensure that the public charter schools that it sponsors comply with the Establishment Clause and the Arizona Constitution, including by revoking or refusing to renew the charters of offending schools; challenge the exercise of, or the failure to exercise, oversight authority by the Arizona Board of Charter Schools over the charters that it sponsors." (Doc. 39 § V.d.)

As a general matter, Doe may maintain standing to sue only for injuries to his *own* interests that can be remedied by a court order. *See Lujan*, 504 U.S. at 561; *Warth v. Seldin*, 422 U.S. 490, 508 (1975). The instant complaint alleges no facts which show that

---

[5]     The claims against the Superintendent of Public Instruction survive only to the extent that he is sued in his capacity as a member of the Arizona Board of Charter Schools.

Doe has suffered an injury as a result of some alleged failure by the Arizona Board of Charter Schools to exercise oversight authority over *other charters*. Alternatively stated, the complaint alleges no injury that would be redressed by some exercise of authority over non-Heritage charter schools.

Therefore, Plaintiffs' request for an injunction against the members and Executive Director of the Arizona State Board for Charter Schools is dismissed to the extent it asks for relief with regard to *all* charters sponsored by the Arizona Board of Charter Schools.

**III.    Motion to Proceed Using Pseudonym**

 "Doe seeks leave to proceed using a pseudonym, without disclosing his identity *to anyone other than the Court*." (Doc. 3 at 3 (emphasis added).)

The federal rules require that each party to a lawsuit be named in the complaint and create a presumption that a plaintiff must litigate its case using its real name. *See* Fed. R. Civ. P. 10(a); *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 596 F.3d 1036, 1042 (9th Cir. 2010). This presumption serves to protect the rights of individuals to confront their accusers and the public's right of access to judicial proceedings. *See id.* Only in special circumstances necessitating anonymity are parties permitted to use pseudonyms. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-1068 (9th Cir. 2000) (parties are permitted to use pseudonym in the "unusual case"); *see also Doe v. Ayers,* 789 F.3d 944, 946 (9th Cir. 2015) (noting that the use of a pseudonym was proper because of the case's exceptional nature); *United States v. Stoterau*, 524 F.3d 988, 1012 (9th Cir. 2008); *United States v. Doe*, 488 F.3d 1154, 1156 n. 1 (9th Cir. 2007). Such circumstances may arise, for example, where there is a threat of physical or mental retaliatory harm, a special need for privacy, or a risk of resulting criminal prosecution. *See Advanced Textile,* 214 F.3d at 1068; *United States v. Doe,* 655 F.2d 920, 922 n. 1 (9th Cir. 1980) (pseudonyms are permitted in unusual cases where it is necessary "to protect a person from harassment, injury, ridicule or personal embarrassment."). To determine whether a party should be permitted to proceed anonymously, the court balances the party's need for anonymity with the "prejudice to the opposing party and the public's

14

interest in knowing the party's identity." *Advanced Textile Corp.*, 214 F.3d at 1067-1068.

Plaintiffs first argue that there is a threat of retaliatory harm if Doe is not allowed to proceed anonymously.  In evaluating whether anonymity is necessary to protect a party from retaliatory harm, the court considers: "(1) the severity of the threatened harm," (2) "the reasonableness of the anonymous party's fears," and (3) "the anonymous party's vulnerability to such retaliation." *Advanced Textile*, 214 F.3d at 1068; *Kamehameha*, 596 F.3d at 1042.

Here, Doe cites no harm that would be occasioned *by him* specifically. (Doc. 4; Doc. 3 at 11.) In his supporting declaration, Doe asserts that should his identity become known, he fears that his family, including his "minor child or children, will be harassed, bullied, verbally abused, and possibly threatened by others in the community." (Doc. 4 at 3.) Doe claims that individuals in his religious community "who publicly voice disagreement with the majority's religious viewpoint are often belittled, harassed, bullied, verbally abused, or shunned." (Doc. 4 at 3.) Doe further maintains that should his identity become known, he fears that his "underage child or children will suffer harassment, bullying, and verbally abuse by other students at school," and will "suffer retaliation by administrators and teachers at Heritage," such as expulsion. (Doc. 4 at 3; *see also* Doc. 3 at 8 ("Doe's minor children would face harassment, threats to physical safety, and ostracism by peers and others in the school community, as well as possible consequences from school personnel, as a result of their obvious connection to plaintiff Doe.").) These fears are based on "the culture of Heritage" which considers "[s]tudents who openly disagree with the religious beliefs promoted by Principal Taylor are considered troublemakers by teachers, administrators, and many of the students," and based "on statements made by Principal Earl Taylor Jr., who … has told parents and students that the student handbook prohibits making negative comments about Heritage Academy or its teachers." (Doc. 4 at 3.)

In looking to the severity of the retaliatory harm alleged, and the reasonableness of the fear that it might occur, the Court first observes that there is no record of any actual

threat that has been made against Doe, his children, or any member of his family. Nor has any evidence been presented that reflects general disapproval of religious complaints within Doe's relevant community or indicates that complainants would be the target of actual threats, harassment or retaliation. For example, Plaintiffs have submitted a draft of a second amended complaint (Doc. 102-1), in which three plaintiffs are added and identified by name – two students who recently graduated from Heritage, and the mother of one of those students. The amended pleading recites a series of complaints made by both students and parents between 2000 and 2016 regarding the religious instruction at Heritage. (Doc. 102-1 at 38-41.) The complaint also alleges that the named parent-plaintiff sent an email to Taylor and met with him in person concerning her objections to his teachings. (Doc. 102-1 at 30-31; *see also* Doc. 88-1 at 27.), Yet, no evidence has been presented that indicates that the individuals who filed or voiced complaints were subject to retaliatory harm, nor do Plaintiffs offer any explanation as to why the named plaintiffs would not befall harm by others in the religious community due to their affiliation with this lawsuit.

Plaintiffs argue that "[b]ased on the alarming history of violence and threats of violence against Establishment Clause plaintiffs in cases like this one that concern religion in public schools, Plaintiff Doe reasonably fears severe retaliatory harm to his family if his identity were revealed." (Doc. 3 at 5.) Plaintiffs submit a declaration of counsel in which he recites comparable cases in which Establishment Clause plaintiffs have been victims of retaliatory conduct. (Doc. 5.) "Courts have rejected this type of 'it has happened before, therefore it might happen here' argument as being insufficient to justify a protective order cloaking plaintiff in anonymity." *Doe v. Pittsylvania County, Va.*, 844 F. Supp. 2d 724, 733-34 (W.D. Va. 2012) (internal quotation omitted). Outside instances of retaliatory harm do not reveal whether there is a similar threat to Doe or his family in this case; not every plaintiff who proceeds without a pseudonym in an Establishment Clause cause is subjected to harassment or violence. *See id.*

While a plaintiff need not prove that a threat of retaliation will be carried out, the

unsubstantiated potential for harm does not justify complete anonymity.  *See Advanced Textile*, 214 F.3d at 1071; *Kamehameha,* 596 F.3d at 1041 ("Although the plaintiffs' parents' affidavits showed 'subjective fear' of retaliation, the court found that, '[a]t most, Plaintiffs' evidence suggests they may be socially ostracized.'"); *Qualls v. Rumsfeld*, 228 F.R.D. 8, 12 (D.D.C. 2005) (holding that vague, unsubstantiated fears of retaliatory actions do not permit a plaintiff to proceed under a pseudonym); *Cf. Doe v. Stegall,* 653 F.2d 180, 186 (5th Cir. 1981) (finding anonymity of children's identities was warranted where threats of violence were generated in connection with the case); *Doe v. Sante Fe Independent School Dist.*, 933 F. Supp. 647, 651 (S.D. Tex. 1996) (allowing minor to proceed anonymously where they had "made revelations concerning their religious beliefs through their constitutional challenge of governmental action. In addition, the newspaper articles and other exhibits submitted by Plaintiffs, considered together, demonstrate[d] the possibility of social ostracization and violence due to militant religious attitudes. Finally, the youth of the minor Plaintiffs ma[de] them particularly vulnerable").

Plaintiffs further argue that anonymity is required to protect Doe's need for privacy and to avoid stigmatization. "Doe, whose religious beliefs differ from the religious beliefs that defendant Heritage Academy teaches its students, has a legitimate need to proceed under a pseudonym so that his and his family's religious beliefs will remain private." (Doc. 3 at 11.) This is unavailing.  In the complaint, Doe objects to religious instruction in public school - not to the religion that is taught. Plaintiffs do not explain why Doe would be forced to disclose his private religious beliefs when his claims are not dependent upon his particular religious views or practices. The fact that this case implicates the topic of religion does not, by mere operation, make it "sensitive and highly personal" in nature.  *See Freedom From Religion Foundation, Inc. v. Emanuel County School System*, 109 F. Supp. 3d 1353, 1357 (S. D. Ga. 2015) ("The fact that religion is an intensely private concern does not inevitably require that an Establishment Clause plaintiff be given Doe status… no court from this or any other circuit has considered a

1  plaintiffs religious beliefs to be a matter of such sensitivity as to automatically entitle the
2  plaintiff to Doe status").

3       Plaintiffs argue that proceeding under a pseudonym is necessary because
4  "[a]lthough plaintiff Doe is not himself a minor, revealing his identity would necessarily
5  reveal the identities of his child or children, including at least one child who attends
6  Heritage Academy." (Doc. 3 at 8.) In this regard, the Court agrees. Doe's child, as a
7  minor that is currently attending Heritage, is especially vulnerable to retaliatory harm by
8  classmates and others in the school community under the particular circumstances
9  presented here. *See Kamehameha*, 596 F.3d at 1045. Thus, although Plaintiffs fail to
10 show that Doe reasonably fears retaliatory harm, the interests in safeguarding the minor's
11 well-being outweigh the public's interest in knowing Doe's identity *at this stage*. *See*
12 *Advanced Textile Corp.*, 214 F.3d at 1070 (noting courts have authority to conceal the
13 "parties' identities in order to… protect nonparties from reprisals"). Nonetheless, when
14 balancing the need to protect the minor's identity, the risk of unfairness to the opposing
15 party, and the availability of less extraordinary measures to provide a reasonable level of
16 protection, the Court concludes that *complete* anonymity is not warranted. *See Ayers*, 789
17 F.3d at 946 ("As for the state's countervailing interests, we also considered 'the precise
18 prejudice at [this particular] stage of the proceedings to the opposing party.'").

19      As argued by Defendants, permitting Doe to remain anonymous would hinder
20 discovery of information that is material to the defense. (Doc. 41 at 6; Doc. 95.) The
21 Court agrees. The facts concerning the student status of Doe's child at Heritage is
22 relevant to whether Doe has continued standing to seek declaratory and prospective
23 injunctive relief. *See Doremus,* 342 U.S. at 434-35 (parents lost standing to sue when
24 their children were graduated); *Madison*, 177 F.3d at 798 ("A student's graduation moots
25 claims for declaratory and injunctive relief, but it does not moot claims for monetary
26 damages."); *Ceniceros v. Board of Trustees of the San Diego Unified Sch. Dist.,* 106 F.3d
27 878, 879 n. 1 (9th Cir. 1997) ("Ceniceros has graduated from high school since the time
28 this action was filed. Consequently, her claims for injunctive and declaratory relief are

moot"); *American Rivers v. National Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997) ("If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed."). [6] Doe's relationship to his child is also relevant to the issue of standing. *See Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 12–18 (2004) (parent whose custodial rights were unclear lacked prudential standing to pursue to bring claim based on activity in the child's classroom).

Plaintiffs argue in response that because there are other parties or grounds which confer standing in this case, discovery regarding Doe's standing is immaterial. Plaintiffs claim Doe and Felton have taxpayer standing, and seek to amend the complaint to add "two former Heritage students and the parent of a former student" as plaintiffs who also have standing. (Doc. 102 at 7.) It is generally true that where one plaintiff has standing to bring the suit, the Court need not consider the standing of the other plaintiffs. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004). However, for the reasons above, neither the parties' status as taxpayers or as *former* parents and students confer standing in this case. Thus, Doe's standing is material to whether there is a live case and controversy, and nondisclosure of his identity would prejudicially inhibit discovery of relevant material.

Doe is directed to amend the complaint to add his true first and last initials in place of the pseudonym John Doe. Unless otherwise ordered by the Court, Doe is permitted to proceed under those initials in all future filings. Should it be determined that Doe's child is not a minor, the child has graduated from Heritage, or Doe's identity has been publically released, Doe will be directed to amend the complaint to add his true name.

---

[6]    The availability of declaratory and injunctive relief is relevant to the existence of a live case and controversy. *See Yniguez v. Arizona*, 975F.2d 646, 647 (9th Cir. 1992) ("A plaintiff's pursuit of nominal damages provides a sufficiently concrete interest in the outcome of the litigation to confer standing...."), *but compare with Freedom from Religion Foundation Inc v. New Kensington Arnold School District*, 832 F.3d 469, 483–84 (3rd Cir. 2016) (discussing that nominal damages alone does not confer standing for prospective relief) and *Morrison v. Board of Educ. of Boyd County*, 521 F.3d 602, 610–11 (6th Cir. 2008) ("While we may have allowed a nominal-damages claim to go forward in an otherwise-moot case… we are not required to relax the basic standing requirement that the relief sought must redress an actual injury").

Counsel for both parties shall confer, draft, and jointly submit a proposed "attorneys eyes only" protective order to facilitate the exchange of discovery in a manner that will protect against the disclosure and dissemination of the minor child's identity. Following submission and approval by the Court, Defendants may seek discovery with regard to Doe.

## IV.    Discovery Disputes

### A.    Protective Order

A Rule 30(b)(6) videotaped deposition of Heritage Academy, Inc. has been scheduled for June 15, 2017. Defendants move the Court for a protective order "prohibiting any party from publishing or disseminating, outside of the court proceeding, audio or video recordings or deposition transcripts obtained during discovery in this action, without prior permission of the Court" (Doc. 87.)[7]  Defendants maintain that Plaintiffs "intend to utilize audio or video recordings or deposition transcripts obtained during discovery for purposes which unrelated to the litigation but rather as tools to 'convict' Heritage Academy Defendants and 'taint' the public perception of the Heritage Academy Defendants before there is even any finding of any wrongdoing." (Doc. 100 at 1.) "Americans United has publicized this lawsuit via one-sided articles with the goals of promoting its 'cause' and soliciting donations." (Doc. 87 at 5-6.)

"It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public. Rule 26(c) authorizes a district court to override this presumption where 'good cause' is shown." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1103 (9th Cir. 1999) (citations omitted). *But see Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016) (whether "compelling reasons" or merely "good cause" must be shown to limit public access and warrant court protection depends on the relationship of the document to the merits of the

---

[7]    In response, Plaintiffs object on the basis of lack of conferral, and Defendants' failure to present the dispute jointly to the Court. While it will not strike the request in this instance, the Court forewarns that future unilateral discovery disputes will not be afforded the same pass.

case). [8] In order to show good cause exists to limit the public's access to material under Rule 26(c), "the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (internal quotations and citations omitted). Rather, the party seeking protection must make a "particularized showing of good cause with respect to [each] individual document." *San Jose Mercury News*, 187 F.3d at 1102.

Here, Defendants do not identify what information might be revealed during the deposition that justifies court protection. Nothing within Rule 26(c) indicates that it extends to prospective, blanket protective orders, and Defendants point to no authority that suggests the contrary. *Cf. Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122,

---

[8]     Rule 26(c) of the Federal Rules of Civil Procedure provides:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

> (A) forbidding the disclosure or discovery; (B) specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery; (C) prescribing a discovery method other than the one selected by the party seeking discovery; (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters; (E) designating the persons who may be present while the discovery is conducted; (F) requiring that a deposition be sealed and opened only on court order; (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and (H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

1131 (9th Cir. 2003) (finding that entering a blanket protective order without requiring the moving party to show that specific discovery, "whether eventually filed with the court or not, contained [confidential] information" was an abuse of discretion under Rule 26(c)); *San Jose Mercury News*, 187 F.3d at 1103 (holding that blanket protective orders "are inherently subject to challenge and modification, as the party resisting disclosure generally has not made a particularized showing of good cause" with respect to any specific disclosure).

Nor do Defendants make any particularized showing that public disclosure of the disposition will cause a clearly defined injury. *See Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995); *AGA Shareholders, LLC v. CSK Auto, Inc.*, 2007 WL 4225450 (D. Ariz. Nov. 28, 2007). The possibility of publicity, alone, does not warrant protection. There is no indication that media attention in this case has been, or is likely to be, so significant or prejudicial that confidentiality is required. Without more, any actual threat of serious embarrassment or harassment resulting from the public dissemination of the deposition is merely speculative. *See Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3rd Cir. 1986) ("because release of information not intended… to be for public consumption will almost always have some tendency to embarrass, an applicant for a protective order whose chief concern is embarrassment must demonstrate that the embarrassment will be particularly serious"); *cf. Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 26-27 (1984) (granting protective order where "affidavits detailed a series of letters and telephone calls defaming the Foundation, its members, and Rhinehart—including several that threatened physical harm to those associated with the Foundation. The affiants also described incidents at the Foundation's headquarters involving attacks, threats, and assaults directed at Foundation members by anonymous individuals and groups. In general, the affidavits averred that public release of the donor lists would adversely affect Foundation membership and income and would subject its members to additional harassment and reprisals.").

There is no allegation that Plaintiffs' publicity of this case has been unlawful or

improper in any manner; Defendants do not allege that Plaintiffs have or will disseminate altered materials. Should Plaintiffs disseminate discovery obtained during the course of discovery for non-judicial purposes with the objective to harass or for financial gain, other avenues for relief are available. However, preemptory challenges unconnected to actual or likely harm does not justify court intervention. In the event discovery mandates disclosure of specific harmful, confidential material, the parties will not be precluded from presenting a request to the Court at that time in a manner tailored to protect the particular interests at hand. *See Foltz*, 331 F.3d at 1136.

Therefore, Defendants having failed to show good cause for a protective order, their request will be denied.

### B.   Requests for Production and to Stay Discovery

On December 9, 2016, Plaintiffs served Requests for Production, "seeking, *inter alia*, basic documents and communications about Heritage's handling of complaints concerning religious influence at its schools, its curriculum and its course materials." (Doc. 88 at 2.) Following the initial request, the parties engaged in a series of discussions regarding the production of electronically stored information ("ESI") both by letter and by phone.

The parties have filed a Joint Motion for Discovery Dispute Resolution (Doc. 88), in which Plaintiffs maintain that Defendants' responsive search and production was inadequate, to which Defendants counter with complaints that the requests are burdensome. Plaintiffs ask that Defendants be compelled to "disclose to Plaintiffs the methodology, search terms, and custodians they utilized in responding to Plaintiffs' requests," and require the parties to "confer and make a good faith effort to reach agreement on a mutually-acceptable search protocol, including search terms, custodians and methodology." (Doc. 88-2.) While the latter request will be granted, the former will not.

First, the Court observes that although various letters exchanged between the parties have been attached to their motion, the discovery requests in dispute have not. The

Court is not inclined to compel a party to disclose "methodology, search terms, and custodians… utilized in responding to… requests for production" without having first assessed whether those requests are relevant and proportional to the needs of the case in the first instance. *See* Fed. R. Civ. P. 26(b)(1).

Second, discovery concerning the preservation and collection efforts of another party can contribute to unnecessary expense and delay, and may inappropriately implicate work product and attorney-client privileged matter. Thus, the Court is not inclined to compel disclosure of this information absent a specific showing that the responding party did not make reasonable and adequate efforts to preserve and collect relevant information. Such a showing has not been made here.[9]

Lastly, the Court has reviewed the parties' dispute in conjunction with the Second Amended Notice of Deposition (Doc. 93) and the Motion to Stay Discovery (Doc. 95). While the Court finds a stay of discovery is not warranted, a stay of the Rule 30(b)(6) deposition is. The filings suggest Plaintiffs' initial requests for production did not include search terms or other ESI parameters, were overly broad, and were unduly burdensome. (*See e.g.*, Doc. 88-1 at 6, discussing RFP No. 21.) Nevertheless, the answer to this problem was not for Defendants to simply conduct a search of ESI on their own terms. Such a unilateral search conflicts with the requirement that the parties must first confer. Thus, as requested by Plaintiffs, the parties are directed to meet and confer in an effort to reach agreement on a mutually-acceptable search protocol, including search terms, custodians and methodology. Should the issues identified in the Rule 30(b)(6) notice not be resolved by conferral, Plaintiffs may propound interrogatories directed at those issues. Plaintiffs shall not take Defendants' Rule 30(b)(6) deposition or seek Court intervention without first attempting to resolve the issues in this manner.

**V.      Requests for Rule 16 and Settlement Conferences**

---

[9]     The unproduced email sent September 11, 2014 (Doc. 88-1, Exh. 5) does not create doubt as to whether Defendants have adequately collected or produced emails which were sent and/or received between 2015 and 2017 – the time period which Defendants specify was searched.

A Rule 16 Case Management Conference will be set by separate order. Because the parties have not had an opportunity to assess their positions in light of the rulings set forth in this order, referral to a magistrate judge is premature. As will be directed, the parties can address whether this case should be referred for a settlement conference in their forthcoming joint Rule 26(f) report.

Accordingly,

**IT IS ORDERED:**

1.    That the First Amended Complaint (Doc. 39) is dismissed with leave to amend;

2.    That Plaintiffs shall have until **June 22, 2017** to file a Second Amended Complaint consistent with the rulings in this Order;

3.    That the Motion to Proceed Using Pseudonym (Doc. 3) is **denied in part** and **granted in part** as set forth above;

4.    That the parties' Stipulation Re: Defendant ADOA Director is **denied as moot** (Doc. 50);

5.    That Motions for Hearing (Docs. 72, 83, 104) are **granted** to the extent a Rule 16 Scheduling Conference will be set by separate order;

6.    That the Joint Motion for Discovery Dispute Resolution (Doc. 88) is **granted in part** and **denied in part** as set forth above;

7.    That the Motion for Protective Order (Doc. 87) is **denied**;

8.    That the Motion to Strike the Motion for Protective Order (Doc. 96) is **denied as moot**; and

9.    That the Motion to Stay Discovery (Doc. 95) is **denied**.

Dated this 8th day of June, 2017.

Honorable Steven P. Logan
United States District Judge